United States District Court
Eastern District of Michigan
Southern Division

United States of America,

v.

D-3 Ayob Nasser,

Defendant.
______________________________/

Case No. 25-cr-20842

Hon. Mark A. Goldsmith

**The United States' Response in Opposition to Ayob Nasser's Motion to Revoke Order of Pretrial Detention**

Ayob Nasser was arrested in November 2025 for conspiring to commit a mass shooting on behalf of the foreign terrorist organization ISIS, as detailed in the 93-page Amended Complaint that lays out the extensive steps Nasser and his co-conspirators took to prepare for their planned attack. (ECF No. 17, Amended Complaint). He was indicted for offenses associated with this conspiracy shortly thereafter. (ECF No. 36, Indictment).

As described in the Amended Complaint and below, Nasser conspired to perpetrate this attack with four co-conspirators: Mohmed Ali (D-1), Majed Mahmoud (D-2), Y.N., and S.A. Nasser's co-defendants are also in pretrial detention. In the months leading up their arrests, Nasser and his co-conspirators accumulated assault rifles and other firearms, bulk ammunition, and tactical firearm components meant to maximize their lethality in an attack they discussed

carrying out on Halloween or a later date. They were only stopped when law enforcement intervened and arrested them.

While Nasser consented to detention shortly after his arrest, he now seeks release on bond. But as the ample information regarding Nasser's offense-related conduct and dangerousness indicates, "no condition or combination of conditions will reasonably assure the appearance of [Nasser] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Nasser should remain detained pending trial.

## Legal Standard

The pretrial release or detention of a defendant is governed by the Bail Reform Act, 18 U.S.C. § 3142. After a hearing, a defendant must be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government bears the burden of demonstrating by (1) clear and convincing evidence that the defendant is a danger to the community, or (2) demonstrating by a preponderance of the evidence that the defendant is a flight risk. *See* 18 U.S.C. § 3142(f)(2)(B) (articulating clear and convincing standard for danger to the community); *United States v. Bartlett*, 731 F. Supp. 3d 836, 851 (E.D. Mich. 2024), *aff'd sub nom. United States v. Semenchuk*,

2024 WL 4751486 (6th Cir. 2024) (internal citations omitted) (applying preponderance of the evidence standard to risk of nonappearance).

To evaluate whether a defendant should be detained pending trial, the Court looks to the factors set forth in 18 U.S.C. § 3142(g), which are: (1) the nature and circumstances of the offense, including whether the crime was a "Federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5); (2) the weight of the evidence of dangerousness; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger posed by the person's release. *See* 18 U.S.C. § 3142(g).

Additionally, Congress has determined that certain terrorism-related crimes, including the section 2339B charge that Nasser and his co-conspirators face, are so serious that there is a rebuttable presumption of detention. 18 U.S.C. § 3142(e)(3)(C) (presumption of detention for any offense listed in 18 U.S.C. § 2332b(g)(5)(B) with a maximum term of imprisonment of ten or more years, which includes section 2339B); *see, e.g., United States v. Musaibli*, No. 18-20495, 2022 WL 1695765, at *10 (E.D. Mich. May 26, 2022) (Lawson, J.) (Section 2339B charges are "so serious that they trigger a rebuttable presumption of pretrial detention under the Bail Reform Act."). There is probable cause for the indicted section 2339B offense to support the presumption of detention in Nasser's case because "[a] grand jury indictment, by itself, establishes probable cause to believe

that a defendant committed the crime with which he is charged." *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985).

This presumption of detention under section 3142(e)(3) imposes a "burden of production" on the defendant to "com[e] forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). The burden of persuasion to show that the defendant is a danger to the community or a risk-of-flight remains with the government. *Stone*, 608 F.3d at 945. And even if the defendant satisfies his burden of production, the presumption in favor of detention does not disappear, but rather "remains a factor to be considered among those weighed by the district court." *Id.* (citing *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *see also, e.g., United States v. Tawfik*, No. 2017 WL 1457494, at *5 (E.D. Mich. Apr. 25, 2017) (Goldsmith, J.) ("[W]hile Tawfik has rebutted the presumption of detention, consideration of all of the evidence—including the evidentiary weight of the now-rebutted presumption—requires detention").

## **Factual Background**

Nasser is indicted for conspiracy to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, and conspiracy to receive and transfer firearms and ammunition knowing or having reasonable cause to believe that such firearms and ammunition would be used to commit a federal crime of terrorism, in violation

of 18 U.S.C. § 924(h). (ECF No. 36, Indictment). The evidence of this conspiracy described in the Amended Complaint—along with the additional evidence the FBI obtained during its continuing investigation following Nasser's arrest—make clear that Nasser and his co-conspirators prepared over the course of months to perpetrate a mass shooting for ISIS and were only stopped when they were arrested and detained.

**The Islamic State of Iraq and al-Sham (ISIS)**

ISIS, including its various aliases designated by the Secretary of State dating back to its predecessor, "Al Qaeda in Iraq," has been one of the most violent and dangerous foreign terrorist organizations over the past twenty years. At its peak, ISIS ruled over parts of Syria and Iraq equivalent to the size of the United Kingdom. Although ISIS has lost most of its physical territory, its leaders and official ISIS publications have encouraged their supporters to conduct terrorist attacks in the United States and other Western countries. In the decade leading up to the charged conspiracy, ISIS supporters like Nasser and his co-conspirators have heeded that call. For example, ISIS has claimed responsibility for a several mass shooting attacks, including the 2016 mass shooting at the Pulse nightclub in Orlando, which killed 29 people, and the 2015 attacks in Paris where one group of attackers carried out a mass shooting at a theater, another group of suicide bombers struck outside the Stade de France stadium, and a third group of attackers fired on

crowded cafes and restaurants. This coordinated ISIS attack in Paris killed approximately 137 individuals and wounded 416. Notably, the evidence in this case indicates that Nasser and his co-conspirators sought to specifically emulate these deadly ISIS attacks in Orlando and Paris, and that they had the means and opportunity to do so.

Since the attacks in Paris and Orlando and indeed, in more recent years, ISIS and its followers have continued to engage in similar attacks in the United States and across the world. For example, ISIS has claimed responsibility for the March 22, 2024, terrorist attack conducted by multiple gunmen at Crocus City Hall, a popular concert venue complex near Moscow. That attack killed approximately 130 people and injured numerous others. An ISIS follower also perpetrated a deadly vehicle ramming attack on January 1, 2025, in New Orleans, where he drove his truck into a crowd and killed approximately 14 individuals and wounded another 57 others. In December 2025, two ISIS supporters with assault rifles engaged in a mass shooting and attempted bombing targeting at a Hanukkah celebration at Bondi Beach in Sydney, killing approximately 15 people and wounding over 40 others. And in March 2026, an ISIS follower, who had already been convicted of attempting to provide material support or resources to ISIS in 2017 and had been released from federal custody in 2024, carried out a shooting attack at Old Dominion University, killing one and wounding two others. These

are just a few examples of the deadly attacks that ISIS and its followers continue to carry out and a reflection of the danger that ISIS followers like Nasser pose.

**June – July 2025:**
**Nasser's Co-Conspirators Discuss Plans for a Mass Shooting on Behalf of ISIS**

Starting in at least June 2025, Nasser and his co-conspirators sought to add their names to this list of notorious ISIS terrorist attacks as they prepared to conduct their own a mass shooting on ISIS's behalf.

In the spring and summer of 2025, two of Nasser's co-conspirators, S.A. and Ali, connected with Tomas Kaan Jimenez-Guzel ("Jimenez-Guzel") and Saed Ali Mirreh ("Mirreh") over social media and encrypted communications applications. S.A. and Ali lived in Dearborn, Michigan; Jimenez-Guzel in Montclair, New Jersey; and Mirreh in Kent, Washington. All of them shared an interest in and support for ISIS and extremist figures who propagated ISIS ideology, including one such Islamic extremist ideologue (the "Islamist Ideologue") who resides in Dearborn, near where Nasser and his co-conspirators resided before their arrests.

By June 2025, S.A. and Ali had begun discussing plans to commit a mass shooting on behalf of ISIS with Mirreh and Jimenez-Guzel. S.A. said that he wanted to carry out an attack similar to Omar Mateen, the shooter responsible for the mass shooting at the LGBTQ+ Pulse nightclub in Orlando in 2016. And while S.A. and Ali were planning a mass shooting attack, Mirreh, Jimenez-Guzel, and

other like-minded individuals in the United States and abroad (the "Travel Group") planned to support ISIS by traveling to Syria and fighting on its behalf. According to Jimenez-Guzel, the timing of S.A. and Ali's planned attack could be affected by when the Travel Group left for Syria, and vice versa, given their shared goal of avoiding detection by law enforcement.

At the end of June 2025, Jimenez-Guzel traveled from New Jersey to Michigan to visit S.A. and Ali. S.A. picked Jimenez-Guzel up from the bus station and drove him to the shared residence of Ali, Nasser, and Y.N., where Jimenez-Guzel stayed for the next two days. While there, Ali and Jimenez-Guzel watched a documentary about the 2013 Boston Marathon bombing. Ali indicated that he was inspired by the Tsarnaev brothers who committed that attack. Later during Jimenez-Guzel's trip, Ali and Jimenez-Guzel re-watched the same documentary, but this time with Nasser and Y.N. While they watched together, Ali commented on mistakes that the Boston Marathon bombers had made during the attack: Nasser and Y.N. laughed at Ali's commentary.

**July – September 2025:**
**Nasser and His Co-Conspirators Begin Stockpiling Firearms**
**to Use for Their Planned Attack**

Less than a month after his trip to visit S.A. and Ali in Michigan, on July 27, 2025, Jimenez-Guzel and others discussed traveling to Syria to join ISIS on an encrypted group call. During the call, Mirreh told the group that he tried to

convince S.A. and Ali to join their planned travel, but that they planned to stay behind and do “the same thing as France.”[1] Just prior to Mirreh’s statement, Jimenez-Guzel told the Travel Group, “Yeah we’re not coming back, bro we are gonna die there [in Syria] Inshallah . . . unless the Emir [commander] sends you to Paris for a 2015,” a reference to the 2015 ISIS attacks in Paris. Jimenez-Guzel also said, “knowing [S.A.] it’s probably going to be at like a club, a disco,” just like the targets in the Paris and Orlando ISIS attacks referenced above.

Consistent with what S.A. and Ali told Jimenez-Guzel and that Jimenez-Guzel and Mirreh had reported to the Travel Group on the July 27, 2025, call, Ali, S.A., Nasser, and their other co-conspirators began acquiring firearms and practicing with them shortly thereafter. On August 24, 2025, Ali purchased a Beretta shotgun from an online retailer for approximately $1,1789.89, and he purchased a Palmetto State Armory (PSA) Sabre AR-15 style rile on September 13, 2025, for approximately $1,037.58. On September 3, 2025, Nasser—who had no regular employment—purchased a Daniel Defense DDM4 AR-15 style rifle from an online retailer, paying approximately $1,490.60. The FBI discovered that Ali had posted a photo online depicting what appeared to be the same DDM4 rifle on a bed (shown below).

---

[1] The call participants referred to S.A. as “Athari” and Ali as “Bukhari.” The FBI later determined, and Jimenez-Guzel and Mirreh both confirmed, that the participants were referring to S.A. and Ali, respectively.



Ali also spent hundreds of dollars on accessories compatible with AR-15 rifles like those he and Nasser had purchased, including a holographic site "built for close-quarter engagements with fast moving targets," a collapsible "mil-spec" carbine stock, a special grip allowing for "maximum weapon control in adverse environments," a muzzle brake to reduce kickback, and what appeared to be a Forced Reset Trigger (FRT), which is an accessory that allows an individual to rapidly increase in the rate of fire in a semiautomatic weapon so as to maximize casualties.

**September 2025:**
**Nasser and his Co-Conspirators Scout Potential Attack Locations in Michigan and the Midwest**

On September 18, 19, and 20, 2025, Nasser and his co-conspirators traveled in separate groups to two locations—the Cedar Point amusement park in Sandusky,

Ohio, and downtown Ferndale, Michigan—to scout possible attack targets. On September 18, 2025, based on cell phone location data for Nasser and Y.N., they drove from Dearborn to Cedar Point, stayed there less than an hour while the park was closed, and then returned to Dearborn. The following day, Nasser and Y.N. returned to Cedar Point, stayed approximately five and a half hours, and then returned home. The search history from a computer later seized from the residence of Ali and Nasser and to which they both had access revealed searches conducted prior to the September 18 and 19 trips that included "is it crowded on halloweekend at cedar point" and "when does halloweekends start at cedar point," apparently in an effort to maximize the body count of their attack.

On September 19, 2025, immediately after Nasser and Y.N.'s scouting trip to Cedar Point, S.A., Ali, and Mahmoud traveled to downtown Ferndale, Michigan. Based on cell phone location data for all three co-conspirators, they visited an area of downtown Ferndale from approximately 11:45 pm to just after midnight. The area of Ferndale to which S.A., Ali, and Mahmoud traveled that night has numerous bars and restaurants, including many that intentionally attract members of the LGBTQ+ community. Moreover, S.A. and Ali returned to the same area of downtown Ferndale the following night, on September 20, 2025, from approximately 11:30 pm until midnight. A later search of Ali's cell phone also revealed a search for "boogie fever ferndale." The Boogie Fever Café is a dance

club and one of the establishments in the area of downtown Ferndale to which S.A., Ali, and Mahmoud traveled. This is also consistent with Jimenez-Guzel's understanding, based on his conversations with Ali and S.A., that they would target a club.

Moreover, other information recovered from Ali's and S.A.'s electronic devices confirmed their intent to carry out an attack similar to that perpetrated by ISIS follower Omar Mateen at Pulse nightclub in Orlando. In particular, Ali's cell phone included searches related to the Pulse nightclub shooting, including "why did omar Mateen shoot that night club" and "officers that died pulse night club." A forensic review of Y.N.'s phone showed that he, too, visited articles about Omar Mateen and FBI press releases on investigative updates from the Pulse nightclub shooting. And S.A. also used his phone to access the following image on September 8, 2025, which appears to be a screen shot of a video game rendering titled "Pulse Night Club anniversary" (pictured below):




In addition, in early October 2025, S.A. accessed a 4-page PDF titled "Inspired Guide Orlando Operation," an article about the ISIS-inspired Pulse nightclub attack, published in June 2016.

**September 2025:**
**The Travel Group References the Planned Attack by Nasser and His Co-Conspirators Again**

On September 22, 2025, Jimenez-Guzel and others had another encrypted group call like the July 27, 2025, call. During this September 22 call, Jimenez-Guzel and the other participants again discussed traveling overseas to join ISIS, and Jimenez-Guzel referenced "brothers doing something else while we go . . . Like a nice surprise. That's all I'm going to say." The "nice surprise" Jimenez-Guzel referred to on September 22 was a reference to the same attack that Mirreh

and Jimenez-Guzel had alluded to in the Travel Group's July 27 group call when they said that S.A. and Ali were staying behind to do "the same thing as France."

**September 2025:**
**Ali Rents a U-Haul Storage Unit Nasser Visited and to Which He Had Access, Where the Co-Conspirators Store Tactical Vests, Backpacks, and Ammunition Magazines**

One day after the September 22, 2025, group call, Ali rented a small U-Haul storage unit in Inkster, Michigan, measuring 4x6x8 feet. Nasser's motion claims Nasser "was never there" and that he "was merely a secondary contact for his brother who actually rented the space at the facility." (ECF No. 124, Nasser's Motion to Revoke Order of Detention, at PageID.675). But security camera footage indicates that Ali and Nasser had visited the same U-Haul facility together on August 14 (as depicted below), just weeks before they began purchasing firearms. At the time Ali rented the U-Haul unit on September 23, Nasser was listed as an alternative contact for the account and had authorized access to the unit.






Access records maintained by U-Haul show that it was accessed on September 23, September 28, and October 9, 2025. The FBI later searched the unit on October 31, 2025, and found two chest rig vests designed to hold ammunition magazines, two identical black backpacks, 24 unopened AR-15 style magazines, and a receipt for the purchase of 30 AR-15 style magazines dated September 21, 2025 (see photos below). These magazines were compatible with the firearms Nasser and his co-conspirators purchased.





**September – October 2025:**
**Nasser and His Co-Conspirators Practice at Shooting Ranges as the Travel Group Again References Their Plans for the Mass Shooting**

Beginning in September 2025, Nasser and his co-conspirators visited gun ranges to practice firing weapons. On September 25, 2025, Ali and Nasser attended a gun range in Belleville, Michigan. Ali brought a gun resembling the Sabre AR-15 rifle that he purchased earlier that month. The two also bought 2 boxes of 50 rounds of 5.56mm ammunition. One day later, Mahmoud purchased a PSA PA-15 multicaliber AR-15 style rifle.

Separately, on October 3, 2025, Jimenez-Guzel and others from the Travel Group had another encrypted group call to discuss their planned travel to join ISIS. One of the call participants stated, "We could just attend the shooting range once, twice, three times practice with toys a few times . . . it's all subject to the decisions and the command of the Emir." The participant then stated, "I'm even thinking of pulling an Athari [S.A.], but probably not here, probably over there. But now when's Athari [S.A.] doing his doing his magic? Not magic." Mirreh then responded, "Dude the thing with Athari [S.A.] is right is um, it would have been bad if I don't know, [Glory be to Allah]. Whatever, whenever we do our thing our first thing then he will do his you know? We're in a great time hey he's doing his thingy they're they're doing their own thingy right they're doing their own thingy . . . " Based on the context of this exchange and the common participants of the

other two calls involving the Traveler Group, "pulling an Athari [SA]" was a reference to S.A.'s intent to carry out an armed attack.

Days after the Traveler Group's October 3, 2025, call, Mahmoud ordered over 1,600 rounds of 5.56mm ammunition—ammunition that is compatible with the AR-15 style rifles purchased by Ali, Nasser, and Mahmoud over the previous month. According to UPS records, Mahmoud received this bulk purchase of ammunition on October 9, 2025. And based on cell site location data and security camera footage, Ali and Mahmoud visited the U-Haul storage unit together that same day and Mahmoud held a large box when they departed (as depicted below).




Ali and Mahmoud also visited a gun range on October 8, 2025. Ali brought his own weapon to shoot, and the two purchased two boxes of 5.56mm ammunition. Ali, Mahmoud, and Nasser also returned to practice shooting at the range on October 16, 2025. They did not rent any weapons, suggesting they

brought their own for practice. They did, however, purchase 5.56mm ammunition at the gun range, despite the fact that Mahmoud had received his bulk purchase of the same type of ammunition a week earlier. Their purchase of additional 5.56mm ammunition to use for shooting practice at the gun range on October 16, 2025, further confirms that Mahmoud was stockpiling the over 1,600 rounds of 5.56mm ammunition he had already received—in preparation for the armed attack Nasser and his co-conspirators were planning.

As the timing of their actions and surrounding communications recounted further below make clear, Nasser and his co-conspirators purchased this arsenal of weapons, stockpiled these thousands of rounds of ammunition, and went to shooting ranges to prepare and practice for their planned mass shooting for ISIS. In September 2025, after his visit to Dearborn and many conversations with S.A. and Ali about the planned attack at a club, Jimenez-Guzel called and spoke with S.A. and Ali. He asked them if they were training and if they knew how to use guns. S.A. and Ali specifically told him that they were going to the range to practice.

**September – October 2025:**
**Nasser and His Co-Conspirators Communicate About Martyrdom and Potential Attack Dates**

Throughout September and October 2025, Nasser and his co-conspirators also exchanged WhatsApp messages in an encrypted WhatsApp chat group titled “Muslimeen,” in which they were the only participants. On October 9, 2025,

Nasser sent the group a message about a new car. Y.N. responded, "I'll be dead before it gets here." S.A. also discussed dying and going to "paradise" with Ali over the phone around the same time. On October 15, 2025, Ali told S.A. that he was fearful. S.A. responded, "The way I see it, is that . . . this is the closest I am to deciding, like, to knowing I am going to Jannah [paradise], [God willing]. If I die in any other way, I'd be ten times more scared that I'd be going to Jahannam [hell], you understand?" Ali then responded, "Yeah, that is true, [God willing]."

In other communications, S.A. and Ali discussed going to the gun range to improve their shooting skills. For example, in a phone call between S.A. and Ali on October 17, 2025—the day after Nasser, Ali, and Mahmoud had gone shooting—S.A. and Ali discussed S.A. going to the range, and Ali responded, "When you go, [God willing], you going, will also be another factor to prove . . . the change. It will all make sense later. But you, try to, try to shoot, try to learn how to shoot . . . It's not as easy as you think." Later that same day, just as S.A. and Ali had discussed, S.A. attended a gun range in Brownstown, Michigan. S.A. rented and fired a handgun, a shotgun, and an AR-15 style rifle.

The conspirators also began to use code words such as "pumpkin" and "fireworks" to communicate about potential attack dates. The term "pumpkin" appeared to refer to an attack date on or near Halloween, and "fireworks" appeared to refer to a date on or near New Year's Eve. In a WhatsApp chat on October 18,

2025, Nasser messaged: "I like fireworks," and S.A. responded: "I hate fireworks. I'm allergic to..Fireworks…Aww man….I guess no fireworks." S.A. then sent the group four pumpkin emojis in a row. Ali responded "HAHAHAHA," and Nasser replied with a firework emoji and "Woohoo." S.A. responded to Nasser's firework emoji with the word "Garbage" and sent an emoji of a trash can with 2026 inside. S.A. sent an emoji of a pumpkin in a treasure chest, possibly reflecting S.A.'s preference for an attack date on or near Halloween. S.A. then sent emojis of 2026 on a dumpster, and a pumpkin overlayed on a building, again expressing a preference for Halloween. Later that day, in a recorded phone call with Ali, S.A. said he did not want to wait any longer and that "we have been preparing for all of this," and, "Listen, I'm going to speak to [Nasser] and [Y.N.] but I'm gonna speak to you . . . I don't think they wanna wait that long either. No way."

In a phone call on October 19, 2025, the next day, S.A. and Ali continued to discuss the date of their planned attack. S.A. appeared to stress his view that they should not delay, stating, "bro, I just don't see the benefit in delaying it. I am not going to lie . . . It's not worth, the, the delaying it, that's what I am trying to say, I am saying the reward is still there . . ." Ali then said, "Too bad . . . you think it's going to be five tough guys and going to . . . five tough guys that just go into it . . ." At around the same time, Nasser can be heard yelling in the background, "[I swear to God], no, [I swear to God]."

On October 23 and 24, 2025, Nasser and his co-conspirators exchanged more WhatsApp messages. Ali and S.A. posted videos of their trips to the gun range, and S.A. messaged the group "American Jewish Center," to which Nasser responded, "pumpkin sounds good now."

On October 24, 2025, Nasser and his co-conspirators exchanged more messages related to the timing of a potential attack. S.A. sent the WhatsApp group an article about a civil lawsuit that recently had been filed against Nasser, stating, "Damn now your extra cooked bro aww man I guess pumpkin it's ok bro I guess ok I guess pumpkin then bro damn ok I guess." Ali responded with a sticker of masked and hooded individual in black clothing with his right index finger pointed up with the rest of his fingers in a closed fist (pictured below):



The gesture of pointing one's right index finger up is commonly used by ISIS members and supporters.

Also on October 24, 2025, Ali and S.A. spoke on the phone about "pumpkin." S.A. specifically asked Ali, "Are you gonna do pumpkin?" and Ali responded, "[By God] [by God,] I would love to, you know [by God], [by God] like genuinely, deep in my heart, [by God] I would love to, I would love to." Ali then stated, apparently using coded language to refer to attacks as "weddings": "Imagine weddings back-to-back. Wow, how beautiful, back-to-back, uh, whatever uh, cakes. Beautiful, woohoo, anniversary for real." S.A. later stated, "Think about it, there won't be a day left for . . . an attack . . . and if someone else offer to make another day and claim every day of the year . . . when they claim every day of the year, that brother did it on that day, we got to do it another day." Later in the call, S.A. told Ali, "So ya, I talked to my brothers. We are going to do pumpkin" and "I talked to my brothers [Nasser] and [Y.N.], they said it is getting bad. So we gotta do pumpkin, ya." That say day, S.A., Ali, and Y.N. visited a gun range together. Ali brought his Sabre AR-15 style rifle and both S.A. and Y.N. practiced shooting with it, as well as another rented rifle.

Finally, on October 28 and 29, 2025, in recorded phone calls, Ali and S.A. discussed their effort to seek guidance from the father of the Islamic Ideologue, who lives in Dearborn near Ali and his co-conspirators but is also known more widely for his radical Islamic views and vocal support of Islamic extremist ideology consistent with that of ISIS. On October 28, S.A. told Ali that he tried to

call the Islamic Ideologue's father, but that the father did not answer so S.A. appeared to suggest that he left a voicemail or message. S.A. said to Ali, "call him or I'll call him," and Ali asked, "the pumpkin?" S.A. responded, "No, I just asked him, like, 'how do you know if the dream is answered?' I told him I got a dream that, pretty much like what you told me. I had a dream of doing a good deed and then it was earlier than when I decided and wait for his answer."

S.A. called the Islamic Ideologue's father again the next morning, on October 29, 2025, and reached him. In that recorded call, S.A. said that he had an "intention to do a good deed," but was "indecisive" about what day to do it. The father of the Islamic Ideologue told S.A. that for a "good deed, just go ahead, right away, no hesitation." S.A. then called Ali and described the call, telling Ali that the Islamic Ideologue's father told him that "if you have something good, do it right away." That same day, based on the FBI's review of Ali's seized cell phone, Ali sent S.A. a message on Telegram in which Ali asked S.A. to post two videos in a particular group chat. One of the videos Ali sent for S.A. to post was a video featuring the Islamic Ideologue in which he states, "it's time the mothers nurse their infants with the love of jihad and the ambition of wanting to become a mujahid [a jihadist fighter] and shaheed [martyr]." The FBI's review of Ali's seized phone also revealed that Ali had searched the web for other information about the Islamic Ideologue and his "lectures." Evidence of S.A.'s activity on his

social media accounts confirmed his familiarity with the Islamic Ideologue and his teaching. Indeed, S.A.'s profile picture on one of his accounts was a picture of the Islamic Ideologue. Nasser, too, appeared to be familiar with the Islamic Ideologue. During the review of Nasser's seized cell phone, the FBI identified an email Nasser sent on October 14, 2025, with a subject like that included the Islamic Ideologue's name and "You got a visit!"

**October 31, 2025:**
**The FBI Locates and Seizes the Firearms, Components, and Ammunition the Nasser and His Co-Conspirators Stockpiled**

On October 31, 2025, the FBI executed search warrants at several locations, including the shared residence of Ali, Nasser, and Y.N., as well as S.A.'s and Mahmoud's residences. In Ali, Nasser, and Y.N.'s residence, officers seized, among other things: the DDM4 AR-15 style rifle that Nasser had purchased on September 3, 2025, with an attached optic, red-dot sight, and pressure switch; the Sabre AR-15 style rifle that Ali purchased on September 13, 2025, with an unattached red-dot sight, tactical flashlight, and an installed forced reset trigger; eight 5.56mm extended magazines; a Beretta 12 gauge shotgun with an attached optic that appeared to match that which Ali purchased on August 24, 2025; two loaded, Sig Sauer 9mm pistols; a CZ 9mm pistol with two empty magazines; a black flash suppressor; two GoPro cameras; a Survivor HK-695 stainless knife with black sheath; a tactical flashlight; an opened UPS package addressed to

Nasser containing an AR-15 firearm stock; an opened UPS package addressed to Nasser containing a JP Enterprises Silent Captured Spring and Geissele Automatics trigger components; a box addressed to Nasser containing two black Rapid Response tactical vests with magazine holders; and an Amazon box addressed to Y.N. containing a weapon sight, tactical flashlight, optic, sling mount, and laser.

In Mahmoud's bedroom, agents seized, among other things: the PSA PA-15 AR-15 style rifle that he purchased on September 26, 2025; a box with two containers holding the approximately 1,680 rounds of 5.56mm ammunition that he purchased in early October 2025; two rifle magazines with ammunition; five opened rifle magazines and five unopened rifle magazines without ammunition; a Mossberg 12 gauge shotgun loaded with five slugs; additional shotgun slugs; a USPS package addressed to Mahmoud containing a JP Enterprises Silent Captured Spring and a Geissele Automatics Super Dynamic 3 Gun AR-15 trigger; and a gear package with a tactical chest rig.

At S.A.'s residence, the FBI seized S.A.'s cell phone. Data from S.A.'s cell phone showed that he participated in numerous Telegram channels where he and other users shared ISIS propaganda and related materials, including on channels containing posts justifying violence, mutilation, and the killing of non-Muslims, as

well as audio and video lessons on topics including the ISIS caliphate and martyrdom operations, among other Islamic extremist content.

In addition, the FBI seized S.A.'s desktop computer and identified a documented titled, "The Final Letter of," which began, "My name is S A , and I was one of the brothers who planned and carried out the A of 1 / 1/202 and this is my final letter to the Americans rather to the disbelievers as a whole, those who claim to be Muslim, and my beloved brothers."[2] S.A.'s letter went on for another four and half pages in which he explained his grievances involving American foreign policy and then praised al Qaeda- and ISIS-inspired attackers including Omar Mateen, the Pulse nightclub shooter, and the Tsarnaev brothers, the Boston Marathon bombers. Based on metadata associated with S.A.'s letter, he created the file on October 7, 2025, and last modified it on October 21, 2025.

**Nasser's Electronic Devices and Internet Searches**

Since the October 31, 2025, arrests, the FBI has reviewed voluminous data obtained from electronic devices used by Nasser. Specifically, Nasser stored and accessed numerous ISIS propaganda items on his electronic devices, including:

- A video calling to the end of tyrants with clips of U.S. political officials and dead U.S. soldiers (accessed 10/14/2025)

[2] S.A.'s letter appeared to include intentional gaps in place of his name and the date of the conspirators' "A " (attack).

- A video celebrating ISIS in 2015 with clips of ISIS members (accessed 10/10/2025)
- A video of what appears to be an ISIS jihadi fighter executing an unknown individual while speaking about showing no mercy to the enemies of Muslims (accessed 10/13/2025)
- A video of a jihadi fighter speaking about enemies' "filthy blood" (accessed 10/13/2025)
- A video about what appear to be ISIS jihadi fighters not giving up with clips of battles and executions (accessed 10/13/2025)

In addition, based on the FBI's forensic review of a desktop computer in Nasser's home, Nasser downloaded every issue (13 total) of the official ISIS propaganda magazine "Rumiyah" on Telegram using his "ayobn" profile on or about September 28 and 29, 2025. The issues of Rumiyah Nasser downloaded featured stories from individuals who traveled to ISIS-controlled territory, and they included explicit direction from ISIS urging ISIS supporters in the West to carry out violent attacks in their home countries, along with a recurring series of articles called "Just Terror Tactics" that contained instructions on how to carry out such attacks using knives, vehicles, and other means. In addition, Nasser was a member of a Telegram group where one of the individuals in Jimenez-Guzel and Mirreh's Travel Group shared ISIS propaganda in the months leading up to Nasser's arrest.

Nasser also searched for information about particular mass casualty attacks like those that he and his conspirators sought to perpetrate. Specifically, Nasser accessed the following content on his electronic device on the following dates:

- A saved TikTok video about the New Orleans ISIS-inspired attacker using Meta glasses (accessed 1/6/2025)
- A GoPro-style first person video of the 2022 Buffalo supermarket shooting (accessed 10/26/2025)
- Body camera footage from Covenant school shooting (accessed 10/26/2025)
- A video of the Christchurch Mosque shooting from the point of view of the shooter (accessed 10/26/2025)
- Nasser asked ChatGPT "Can the GoPro hero 11 black creator edition live stream" (10/30/2025)

Notably, both the 2022 Buffalo supermarket shooting and the 2019 Christchurch shootings were videorecorded and livestreamed by the shooters using GoPro-style cameras to provide a first-person point of view. And when the FBI searched Nasser's residence, agents found two GoPro cameras in a room that he shared with Ali and Y.N.

And Nasser conducted many more searches on the web and the ChatGPT artificial intelligence application suggesting that he was planning a mass shooting on behalf of ISIS, including:

- retribution
- cop body armor
- can you run a frt trigger [forced reset trigger] with the hypertap [muzzle brake]
- can i paint my muzzle brake if its tan and my gun is black and i want it to be black [sic]
- 9/11
- boston marathon bombing (and searches on the Tsarnaev brothers)
- sources explaining rules in war in islam
- does shariah support killing gays
- jihad
- new zealand mosque shooting footage
- dying at an old age being worse than strikes of a sword
- does a martyr go to jannah

**November 2025:**
**The Arrest of Nasser and His Co-Conspirators, and Nasser's Pretrial Detention**

The FBI arrested three of Nasser's co-conspirators, S.A., Ali, and Mahmoud, on October 31, 2025, prior to arresting Nasser and Y.N., and prior to seizing some of the evidence described above, such as the records from the "Muslimeen" WhatsApp group chat in which Nasser told his co-conspirators that

"pumpkin sounds good now." As confirmation of how real and dangerous the Dearborn conspirators' attack plan was, Jimenez-Guzel, Mirreh, and other members of the Travel Group accelerated their travel plans after learning of the arrests in the news. In fact, after the original complaint detailing much of the Dearborn attack plot conspiracy was unsealed on November 3, 2025, Jimenez-Guzel told an FBI Confidential Human Source that "[t]he feds are gonna be looking for us in a week maybe, so we are leaving today or tomorrow . . . " and that the conspirators in Dearborn "were planning to do something. I'm not gonna say what, but do something here." The next day, Jimenez-Guzel and Mirreh obtained tickets to depart the United States within twenty-four hours, and they were both arrested and charged in the District of New Jersey before they could embark on those flights. In July 2026, both Jimenez-Guzel and Mirreh pled guilty to conspiring to provide material support or resources to ISIS, in violation of section 2339B, in connection with their plan to travel to join ISIS as fighters abroad.

Nasser was arrested on November 5, 2025, for charges in relation to his participation in the attack plot conspiracy in Dearborn. He consented to detention five days later. (ECF No. 34). A grand jury returned an indictment charging Nasser, Ali, and Mahmoud on November 12, 2025. (ECF No. 36).

## Argument

### I. There is a presumption of detention in this case, and Nasser has not rebutted it

The presumption in favor of detention exists in this case, which Nasser does not dispute. (ECF No. 124, at PageID.672). And Nasser has not met his burden of production to show that he is not a flight risk or a danger to the community. Disregarding the evidence of his and his co-conspirators' conduct to plan and prepare for an attack on behalf of ISIS as recounted above, Nasser claims that the "core" of the alleged conduct is "speech—words exchanged online among young men." (*Id.*, PageID.667). He also claims that "[n]o attack was ever really confirmed to any identified target or date" and that no violent acts were "imminent," *see id.* at PageID.667–68, despite the fact that he and his co-conspirators had physically scouted and researched targets on the internet, amassed an arsenal of guns and ammunition, and trained at ranges to conduct a mass shooting, and despite their discussion of potential attack dates—including Halloween—just before their arrests that day. Nasser's claims are contrary to the weighty evidence of his and his co-conspirators' conduct, and they do not satisfy the burden of production to rebut the presumption of detention here.

Nasser also points to several aspects of his personal background, none of which are sufficient to rebut the presumption. First, Nasser points to his age (19), his lack of criminal history, and the fact that he lived at home with his parents prior

to his arrest. (*Id.*, PageID.674). He also highlights that his parents are willing to serve as third party custodians if he is released. (*Id.*) Problematically, though, Nasser's prior home environment apparently facilitated his criminal conduct. Nasser lived at home together with his parents prior to his arrest, and this environment did not prevent his radicalization, nor his decision to plan a mass shooting attack for ISIS. This is the same home where Jimenez-Guzel met Nasser, Ali, and Y.N. in the summer of 2025, and where Ali discussed his intention to carry out an attack. It is also the home where Nasser, Ali, and Y.N. received shipments of multiple firearms and firearms components in the months leading up to their arrests, apparently without any interference from Nasser's parents.

Moreover, Nasser's age actually strengthens the presumption for detention rather than rebutting it. Nasser argues that people of the same age often lack maturity and are more susceptible to outside influences and pressures, which actually makes him more of a danger, not less. (*Id.*, PageID.676). Unfortunately, Nasser appears to have followed in the footsteps of the many other young men who found ISIS and its messages of violent jihad particularly alluring, as propagated in ISIS materials like the Rumiyah issues that Nasser downloaded as he was plotting this attack with his co-conspirators. Given Nasser's radicalization and ineffective third-party custodians, Nasser's release could be problematic at best, and disastrous at worst. And the fact that Nasser lacks a criminal history is not

remarkable and does not rebut the presumption in favor of detention for the crimes with which he is charged. Other prominent ISIS-inspired attackers including Omar Mateen (the 2015 Pulse nightclub shooter) and the 2025 New Orleans attacker also lacked criminal histories before they committed their grizzly attacks. Thus, Nasser's age and lack of criminal history should move the Court no closer to finding that Nasser has overcome the presumption of detention in this case.

Finally, Nasser highlights that he did not flee in the week between the FBI search of his home and his arrest, apparently suggesting that he is not a flight risk now. But there is a significant difference between Nasser's choice not to flee in October 2025 before he was charged, and the choice he may face now knowing the nature and severity of the charges and the weight of the evidence against him. Thus, Nasser's pre-charge behavior does not inform the Court about the risk of flight he poses if he is now released on bond. And it does not rebut the presumption of detention.

## II. The 3142(g) factors strongly favor Nasser's continued pretrial detention

Even if the Court finds that Nasser has rebutted the congressionally mandated presumption of detention, the government easily carries its burden of persuasion that the section 3142(g) factors weigh overwhelmingly in favor of Nasser's continued pretrial detention.

### a. Nature and circumstances of Nasser's charged offenses

The severity of Nasser's charged offenses cannot be overstated. And while Nasser laments the lack of "deference to the presumption of innocence in these cases," (*Id.*, PageID.669), the Bail Reform Act directs the Court to consider the charged conduct when evaluating the propriety of the defendant's pretrial release. 18 U.S.C. § 3142(g)(1). Simply put, Nasser's "presumption of innocence" is not relevant for purposes of his motion for release on bond. But his charged conduct is. And it is of the most grave and dangerous variety.

As described above, Nasser and his co-conspirators conspired to commit a mass shooting on behalf of ISIS and acquired numerous firearms and ammunition in the process. His co-conspirators openly discussed these plans with other individuals, including Jimenez-Guzel and Mirreh (who attempted to flee the country and join ISIS abroad once three of Nasser's co-conspirators were arrested), and with each other. And Nasser was far from a passive observer to these plans. Roughly a month after the Travel Group referenced plans by S.A. and Ali to commit armed attack, Nasser purchased a Daniel Defense DDM4 AR-15 style rifle from an online retailer. About a week and a half before this purchase, Nasser's co-conspirator, Ali, purchased a Beretta shotgun. And about a week and a half after Nasser's DDM4 purchase, Ali bought a Sabre AR-15 style rile.

Fifteen days after his DDM 4 purchase, on September 18, 2025, Nasser and Y.N. made their first trip to Cedar Point and then returned again the next day.

Nasser and Y.N. did not enter the park on the first day, but did on the second. The FBI's forensic examination indicates that two days before the first trip, Nasser accessed multiple Cedar Point maps on his phone. And this was not an innocent trip—it was a scouting mission. Nasser specifically visited Cedar Point's calendar and hours webpage in the days prior to his trips in September, specifically searching "when does cedar point open" and "when does cedar point close." And yet, on September 18, Nasser and Y.N. drove more than two hours to Cedar Point and arrived more than six hours before the park opened to visitors. Nasser and Y.N. had calls with Ali during both trips.

And on September 19 and 20, 2025, Nasser's co-conspirators conducted a similar scouting trip to the downtown area of Ferndale, Michigan, which is known for having numerous clubs and bars which intentionally attract members of the LGBTQ+ community. S.A., Ali, and Mahmoud traveled together for the first Ferndale trip, late at night, on September 19. S.A. and Ali returned to the same area, around the same time, a day later. Given the timing of their presence in Ferndale and the evidence of their religious radicalization, it is clear that his co-conspirators were not there to patronize any of these establishments or for any other non-nefarious purpose.

In the month leading up to his arrest, Nasser continued to actively participate in the conspiracy. He visited the U-Haul storage facility with Ali and was an

alternate contact. On October 16, 2025, Nasser went to a gun range with Ali and Mahmoud; Ali and Mahmoud had visited the range together about a week prior on October 8, 2025. On October 23 and 24, 2025, Nasser, Ali, S.A., Mahmoud, and Y.N. continued to exchange WhatsApp messages regarding the planned attack. Ali and S.A. posted videos of their trips to the gun range, and S.A. messaged the group "American Jewish Center," to which Nasser responded, "pumpkin sounds good now." And when agents searched his house, they found two tactical vests, and AR-15 stock, AR-15 trigger components, and a silent capture in boxes addressed to Nasser. Nasser's conduct is not a fleeting mistake or misjudgment that can be chalked up to youth, nor is it just "words"—he planned over the course of months to acquire and practice with weapons of war that he and his co-conspirators sought to use to inflict mass death in the name of ISIS. It was only through FBI's investigation and the arrest of Nasser and his co-conspirators that they were prevented from doing so.

Perhaps unsurprisingly, Nasser seeks to distance himself from his co-conspirators in his request for bond, even suggesting that the government delayed his arrest by a matter of days because he was "less culpable" than his co-defendants. (*Id.*, PageID.674). Nasser also suggests he is guilty of nothing more than "[l]awful firearm ownership" and that he should not be detained "on the basis of the group's aggregate conduct or possessions." (*Id.*, PageID.675–76). But as the

above facts demonstrate, Nasser's behavior cannot be separated from the context of his co-conspirator's statements and actions, all of which point to the same conclusion: that they had agreed on and were planning a mass shooting on behalf of ISIS. The government is not asking the Court to find that Nasser is dangerous only because he purchased an AR-15 rifle in September 2025. But the fact that he did so within weeks of scouting potential attack locations, going to a gun range with Ali and Mahmoud to practice shooting, consuming violent ISIS propaganda, and indicating his enthusiasm for attacking the "American Jewish Center" and other targets puts Nasser's purchase of the AR-15 rifle into its proper context. And it is difficult to imagine offense conduct that more clearly justifies pretrial detention.

**b. The weight of the evidence as to Nasser's dangerousness**

In the Sixth Circuit, the weight of the evidence in 18 U.S.C. § 3142(g) refers to the evidence of a defendant's dangerousness, not guilt. *Stone*, 608 F.3d at 948. And the evidence of the danger that Nasser poses to the community if released is staggering. While Nasser argues that any danger he poses is ameliorated by the fact that he no longer has access to weapons, this misstates the true nature of Nasser's dangerousness. Less than 12 months ago, Nasser's support for ISIS led him to conspire with others to inflict massive casualties in the name of radical religious beliefs. It is unlikely that Nasser has discarded those beliefs in such a short span of

time. And just because the FBI has removed the previously acquired weapons from Nasser's home does not prevent him from acquiring new weapons, or from using something more easily accessible—such as a vehicle, like other ISIS attackers—to inflict injury, or even death, on innocent people.[3] Nasser had downloaded ISIS materials that provided exactly this type of instruction on how to inflict maximum death and destruction even without the firearms. And the Court can set no conditions of bond to reasonably prevent this grim possibility.

**c. Nasser's history and characteristics**

The government recognizes that Nasser—like many would-be terrorist attackers who are disrupted by law enforcement—has no serious prior convictions. And if Nasser were charged with a different crime, that fact may even weigh in favor of release. But with crimes of terrorism, radicalization is more significant than criminal history. The January 2025 ISIS-inspired attacker in New Orleans had no significant criminal history and was an honorably discharged U.S. Army veteran. Omar Mateen, the ISIS-inspired Pulse Nightclub attacker, who was particularly inspiring to the Dearborn attackers, had no criminal history, and

---

[3] As noted above, the January 2025 New Orleans ISIS attacker used a truck to perpetrate an attack that killed 15 people. More recently, on July 25, 2026, a 21-year-old with ties to ISIS drove a van into a crowd at a Pride Day celebration in Berlin, killing one person and injuring dozens more. The suspect died in a shootout with police after a 24-hour manhunt. *See* https://www.cbsnews.com/news/berlin-germany-pride-attack-abdul-ballout-isis/.

neither did the San Bernardino ISIS-inspired attackers who killed 14 people and wounded 22 others in December 2015. And the Tsarnaev brothers, another inspiration to these conspirators, likewise had no criminal convictions prior to perpetrating their attack at the Boston Marathon.

Radicalization matters in terrorism crimes, and the evidence here shows that Nasser was radicalized and motivated to commit a mass casualty attack on behalf of ISIS before his arrest. So despite his lack of criminal history, his history and characteristics still weigh in favor of his detention on these charges.

**d. The nature and seriousness of the danger Nasser poses to the community**

In October 2025, Nasser and his co-conspirators were poised to inflict unspeakable harm in the name of ISIS, a violent terrorist organization. In the span of just a few months leading up to that, Nasser and his co-conspirators stockpiled an arsenal of weapons and ammunition, practiced shooting at gun ranges, scouted potential locations for an attack, researched other ISIS-inspired mass shootings, and consumed violent ISIS propaganda to prepare for their own martyrdom. Nasser cannot extract himself from these allegations. And he cannot credibly argue that they favor his release on bond pending trial.

Moreover, Nasser proposes home detention at the same house in Dearborn where he plotted with his co-conspirators—and near the Islamic Ideologue who was one of the radicalizing figures whose ideology motivated them to inflict

violence in the name of ISIS. This environment could serve as a catalyst to further radicalization and violence.

Thus, the nature and seriousness of the danger that Nasser poses to the community if released weighs heavily in favor of his continued detention.

### III. Nasser is also a flight risk

Given Nasser's affinity for ISIS, he is also a flight risk. As evidenced by the actions and communications of the Travel Group, with whom two of Nasser's co-conspirators communicated, it is common for young people—and young men in particular—to demonstrate their support for ISIS by attempting to travel abroad to fight on its behalf. It is not stretch to think that Nasser could make that choice if not detained, particularly when he faces such severe allegations and consequences if he stays.

## Conclusion

Nasser should remain detained pending trial in this case.

JEROME F. GORGON JR.
United States Attorney

*s/ Hank Moon*

Erin L. Ramamurthy
Hank Moon
Assistant United States Attorneys
211 West Fort, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-0220

*s/ John Cella*
John Cella
Trial Attorney
National Security Division
Counterterrorism Section
950 Pennsylvania Ave NW
Washington, DC 20530
Telephone: (202) 514-2007
E-mail: John.Cella@usdoj.gov

August 18, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ Hank Moon*
Hank Moon
Assistant U.S. Attorney